MARVIN G. PALMER AND MARGARET PALMER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Palmer v. Commissioner
Docket No. 6730-82.
United States Tax Court
T.C. Memo 1987-204; 1987 Tax Ct. Memo LEXIS 200; 53 T.C.M. (CCH) 629; T.C.M. (RIA) 87204; April 21, 1987. John E. Woodbery,William C. Ruthford, and William P. McArdel III, for the petitioners. James A. Nelson, for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined deficiencies and additions to tax in petitioners' Federal income tax as follows: Taxable Year
Addition to Tax
Ended
Deficiency
Section 6653(b) [1]
1969
$10.00
$5.00
1970
38.00
19.00
1971
96.00
48.00
1972
2,826.00
1,413.00
1973
17,934.00
8,967.00
1974
26,926.00
15,581.00
1975
38,293.00
36,498.00
1976
6,073.00
23,197.00
1977
1,545.00
28,120.00
1978
6,560.00
3,280.00
1979
9,488.00
1980
11,116.00
After concessions, [2] the issues for determination *202 are: (1) Whether petitioner is liable for additions to tax for fraud under section 6653(b) for taxable years 1969 through 1978; (2) whether petitioner constructively received interest income in taxable year 1976; (3) whether petitioner is liable for additions to tax for negligence under section 6653(a) for the taxable years 1969 through 1978, if the Court finds section 6653(b) not to be applicable; and (4) whether the additions to tax pursuant to sections 6653(a) and (b) are tax pursuant to section 6659(a) (now codified at section 6662(a)) and may be offset by investment tax credit carrybacks under sections 38 and 46. *203 FINDINGS OF FACT Some of the facts are stipulated and are found accordingly. The stipulation of facts, supplemental stipulation of facts, and the attached exhibits are incorporated herein by this reference. Petitioners resided in Kennewick, Washington, when they filed their petition in this case. Petitioner is an ophthalmologist and has practiced medicine in the Tri-Cities area since 1960. [3]
In 1974, petitioner became interested in purchasing farm land in Benton County, Washington. During 1975, after various inquiries, petitioner focused his interest on a particular parcel which consisted of 3,920 acres of dry-land wheat acreage in an area known as Horse Heaven Hills in southeast Washington state. This particular acreage was known as the "Barber Ranch." [4] Jim Peters ("Peters") showed the Barber Ranch to petitioner in October, 1975. About this time, petitioner met Dean Loney ("Loney"), a prominent attorney in the area. Upon inquiry in 1975, the Barber Ranch was offered to petitioner at $350 per acre or $1,372,000. *204 On January 20, 1976, Peters, on behalf of himself and others including petitioner, applied for three loans with the John Hancock Mutual Life Insurance Company (hereinafter "John Hancock") to purchase the 19,838 acres. [5] Although petitioner never signed the application, petitioner's name and financial information appear on one loan application for $520,000. This loan application concerned the purchase of the 3,920 acre portion of the 19,838 acres which represented the Barber Ranch. In the same loan *205 application package, John Hancock, in its home office in Boston, Massachusetts, received a general memorandum prepared at the Spokane, Washington, field office which noted that petitioner's acreage (3,920 acres, the Barber Ranch) was to be sold to petitioner for $1,302,700. Before the loan closings, John Hancock appraised the Barber Ranch at $695,975. [6]
During January 1976, petitioner submitted an individual financial statement to John Hancock to see if he could qualify alone for the purchase of the Barber Ranch. Joan Slagle ("Slagle"), office manager for the CPA firm of Franklin, Mahan, Mairs, & Phaff, delivered the financial statement to John Hancock in Spokane, *206 Washington, on January 20, 1976. Petitioner's financial statement listed a $340,000 amount noted as a property deposit with a five to eight percent yield. The $340,000 deposit constituted most of petitioner's liquid assets as of January 1976. [7]
On February 2, 1976, the John Hancock loan commitments were approved for petitioner's purchase of the Barber Ranch and to Loney, Peters, and Jack Wood ("Wood") for the other acreage. [8] Petitioner and the other co-signators executed a first mortgage for $520,000 to John Hancock on March 25, 1976. The mortgage was recorded on March 26, 1976. Additionally, on May 19, 1976, petitioner executed a second mortgage note to the North Patterson Company. [9] The loan transactions closed on April 30, 1976. *207 Sometime in April or May, Loney, Peters, and Wood acquired sole rights to buy the 19,838 acres. On May 6, 1976, the deed to the Barber Ranch was recorded. On May 6, 1976, an Excise Tax Statement was filed, showing the Barber Ranch sale to petitioner at a purchase price of $960,000. Loney signed under oath and filed the Excise Tax Statement in Benton County, Washington. On the basis of all findings, we find the purchase price of the Barber Ranch to be $960,000. When petitioner purchased the Barber Ranch, the acreage was dry land with no irrigation. Subsequent to 1976, petitioner borrowed in excess of $2,000,000 from John Hancock to finance the development of irrigation for a portion of the Barber Ranch. During the fall of 1975, Loney offered petitioner an investment opportunity in a limited partnership known as Montana Pacific Oil and Gas #2 (hereinafter MPOG #2). Loney represented to petitioner that MPOG #2 was to enter into a contract with a drilling company to drill oil wells on the Imperial Crag Leases in the Kevin - Sunburst Oil Field in Montana. Loney represented to petitioner that not only was there a good chance of finding oil but that petitioner's share of the intangible *208 drilling costs could be deducted for petitioner's taxable year 1975 provided the drilling contract was signed during 1975. Petitioner asked his CPA, Charles Franklin ("Franklin"), to meet with Loney to determine the validity of the deduction. Neither petitioner nor Franklin were well versed in the technicalities of oil and gas investments. In his meeting with Loney, Franklin's concern centered on the legitimacy of the deductibility of the investment. After his meeting with Loney, Franklin believed that the operation was legitimate and that petitioner could be confident in the deductibility of the intangible drilling costs. As a result, Franklin told petitioner that the investment in MPOG #2 would result in a legitimate tax deduction. On December 23, 1975, petitioner paid Loney $340,000 for an interest in MPOG #2. The $340,000 total amount consisted of 11 checks varying in amount from $5,000 to $190,000. Prior to December 23, 1975, Franklin collected the checks at his office and on December 23, 1975, his office manager, Slagle, delivered the $340,000 amount to Loney. Upon receipt of the $340,000 from petitioner, Loney immediately deposited the money to the account of MPOG *209 #2 at the Columbia Center National Bank in Kennewick, Washington. Loney instructed the bank to issue a $340,000 check drawn on the account of MPOG #2 made payable to J. D. Oil Drilling Account #2. Loney deposited this check in the J. D. Oil Drilling Account #2. On the same date, December 23, 1975, Loney purchased a $340,000 30-day certificate of deposit in the name of J. D. Oil Drilling Account #2. Loney and his secretary, Carol Vance, had signatory authority over the MPOG #2 account. Loney had sole signatory authority over the J. D. Oil Drilling Account #2. On December 23, 1975, after these banking transactions transpired at the Columbia Center National Bank, Slagle took the $340,000 certificate back to the CPA firm of Franklin, Mahan, Mairs & Phaff and placed the certificate in an envelope in the office safe with petitioner's name on it. On January 22, 1976, Slagle personally delivered the certificate to petitioner at his office. On the same day, Loney's secretary retrieved the certificate from petitioner. At that time, Loney renewed the certificate of deposit. From January 22, 1976, and thereafter, Loney retained possession of the $340,000 certificate. Loney renewed the *210 certificate on February 21, 1976. On March 24, 1976, Loney cashed the certificate and deposited the total proceeds of $341,416.67 to his personal savings account. Commencing in January 1976 and ending on January 23, 1976, a single oil well was drilled on the Imperial Crag Leases. The Fulton Producing Company or its subsidiary drilled the well pursuant to a farmout agreement between Montana Pacific Oil and Gas Co. ("MPOG Co.") and Fulton Producing Co., dated December 27, 1975. [10] The cost of drilling was estimated at $50,000. The Fulton Producing Company determined the well to be dry. Loney learned of the dry hole on January 23, 1976. Loney communicated this fact to petitioner in late January or early February 1976. On or about March 15, 1976, MPOG #2 filed a Form 1065 1975 tax return prepared by CPA Robert E. Marple ("Marple"), accountant for Loney. In preparing petitioners' Federal income *211 tax return for 1975, Franklin utilized the Schedule K-1 which Marple supplied to Franklin. On their 1975 Form 1040 return, petitioners deducted the $340,000 payment made for petitioner's investment in MPOG #2 as an intangible drilling cost. Forms 1065 for the taxable years 1976 and 1977 of the partnership do not list petitioner as a partner. In 1977, the partnership was terminated. From the time petitioner became a partner in the MPOG #2 partnership in December 1975, petitioner's only evidence of his partnership interest was a copy of a partnership agreement unsigned by the general partner, Loney. [11]
On June 3, 1979, a day before an audit meeting with the Internal Revenue Service agents, petitioner met with Loney and received a signed copy of the partnership agreement. Moreover, petitioner received from Loney a written statement that future drilling plans for MPOG #2 were undetermined. Loney also advised petitioner via this written statement that petitioner had a continuing interest in MPOG #2. During 1977, petitioner was contacted by an entity entitled Western Mortgage which was *212 selling uranium investments in Northwest Uranium Company. In 1977, Loney also offered petitioner the same investment in Northwest Uranium Company. However, Loney's deal would not entail making a cash investment. Again, petitioner consulted with Franklin concerning the deductibility of the payment. Franklin concluded that the deduction was legitimate. Petitioner accepted Loney's proposal and signed a note for the entire investment amount of $168,000. The note was never paid as the company went bankrupt. On his 1977 Form 1040 return, petitioner claimed a $168,000 deduction on his Schedule C for an advance royalty payment on an uranium investment. Respondent asserts that Loney and petitioner conspired together to obtain a $340,000 intangible drilling cost deduction for petitioner on his 1975 Federal income tax return and to have that same $340,000 payment serve as a down payment on the Barber Ranch. Respondent notes that while Loney was probably the master mind of this scheme, petitioner went along with the scheme in an effort to significantly reduce his purchase price of the farm land. Respondent further asserts that the $168,000 deduction for an advance minimum royalty on *213 the uranium investment which petitioner claimed in 1977 is a further extension of a scheme to defraud the government. Petitioner concedes the disallowance of the deduction in MPOG #2 and in the uranium investment due to changes of law subsequent to the filing of the returns. However, petitioner asserts that he did not commit fraud in claiming the $340,000 or $168,000 deductions on his tax returns. Petitioner asserts that he properly relied on the advice of his CPA, Franklin, and the partnership's CPA, Marple, who prepared MPOG #2's Schedule K-1 and Form 1065. OPINION The primary issue before us is whether petitioner is liable for an addition to tax under section 6653(b) for taxable years 1969 through 1978. Section 6653(b) imposes an addition to tax if any part of an underpayment of tax is due to fraud. Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); . Respondent must show that petitioner intended to evade taxes which he knew or believed that he owed, by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. ; *214 ; . The elements to be established are (1) an underpayment of tax [12] and (2) that some part of this underpayment is due to fraud. . Petitioners concede that they wrongfully deducted the $340,000 loss on their 1975 Federal income tax return and the $168,000 advance minimum royalty payment on their 1977 Federal income tax return. Our inquiry, therefore, is narrowed to determining whether the underpayment resulted from a fraudulent intent on the part of petitioner. The existence of fraud is a factual question to be determined by an examination of the entire record. , affd. in an unpublished opinion . Fraud will never be presumed. . Fraud may, however, be proved by *215 circumstantial evidence because direct proof of taxpayer's intent is rarely available, and taxpayer's entire course of conduct may establish the requisite fraudulent intent. ; . However, fraud is never imputed or presumed and courts should not sustain findings of fraud upon the circumstances that, at most, create only a suspicion. . Even a strong suspicion is not sufficient to show fraud, but fraud must be established by evidence that is clear and convincing. . In the instant case, respondent asserts that the following factors establish that petitioners' 1975 and 1977 returns were fraudulent. First, respondent asserts that the $340,000 which was allegedly paid by petitioner to Loney for an interest in MPOG #2 was never used for drilling costs. Second, respondent contends that the selling price of the Barber land was $1,302,700 and included petitioner's $340,000 as a downpayment. As a result, respondent contends that petitioner and Loney *216 conspired to obtain a $340,000 intangible drilling cost ("IDC") deduction on petitioners' 1975 tax return while, at the same time, utilizing the same $340,000 amount as a down payment on the Barber Ranch. While respondent acknowledges that Loney was the mastermind of this operation, respondent asserts that petitioner knew and agreed to participate in a scheme whereby petitioner would take a deduction to which he was not entitled. Respondent points to the advance minimum royalty deduction which petitioner claimed on his 1977 return as a further effort to reduce his effective purchase price on the Barber Ranch. In sum, respondent believes that the evidence presented at trial illustrates that petitioner had the requisite fraudulent intent. We disagree. Upon a careful examination of the testimony and record in this case, we believe that petitioner did not know that his MPOG #2 investment was not legitimate. Rather, based on the record before us, we believe that Loney defrauded petitioner and that it was not until the audit meeting of June 4, 1979, that petitioner learned that he did not own an interest in MPOG #2. In 1975, Loney was known as a well-respected attorney and hard-nosed *217 businessman in the community. Even so, upon being approached by Loney concerning the MPOG #2 investment, petitioner immediately contacted his accountant, Franklin, for advice. Franklin met with Loney and concluded that the IDC deduction was legitimate. Petitioner also consulted Franklin on the advance minimum royalty deduction. Franklin concluded that the deduction was legitimate as well. We recognize that both Franklin and petitioner were not oil and gas experts. However, Franklin served as petitioner's accountant for many years. Moreover, during the taxable years in issue, the deductibility of both intangible drilling costs and advance royalty payments were unsettled legal issues. Although these deductions were later nullified by case and regulatory law, [13] we find that petitioner justifiably relied on the advice of his accountant in taking both the $340,000 IDC deduction on his 1975 return and the $168,000 advance minimum royalty deduction on his 1977 return. See ; . See also . *218 Respondent contends that the selling price of the Barber Ranch was firm at $350 per acre or $1,372,000. Respondent also asserts that the purchase price was $1,302,700 based on the information contained in the general memorandum to John Hancock which related that the price of the Barber Ranch supplied by an unidentified party to John Hancock was $1,302,700. Respondent contends that this price was paid by petitioner with a $520,000 note to John Hancock, a $440,000 second mortgage, the $340,000 downpayment plus interest on the $340,000 for *219 two months of $2,700. [14] We agree with petitioner that there is a discrepancy between what respondent calls the "firm" price of $350 per acre or $1,372,000 and the $1,302,700 purchase price noted in the general memorandum to John Hancock. When considered correlatively with the fact that the excise tax affidavit lists the purchase price as $960,000, we find that the purchase price of the Barber Ranch was $960,000. Moreover, Loney purchased the certificate of deposit in the name of J.D. Oil Drilling Account #2 and had sole signatory power over such account. Even if petitioner had possession of the certificate on January 22, 1976, for *220 even a few hours and his CPA Franklin had the certificate in the office safe for the preceding month, neither petitioner nor Franklin could have cashed the certificate. More importantly, it would seem that if the certificate was in the name of J.D. Oil Drilling Account #2, petitioner would not have been alerted to the fact that the funds were not to be used for the drilling purposes of MPOG #2. Further, we find that neither petitioner nor Franklin attempted to mislead respondent's agents during the audit. While there was some misunderstanding concerning petitioner's statement that he received some sort of "deal" on his purchase of the Barber Ranch after the MPOG #2 well was found to be dry, we believe that petitioner was merely referring to the fact that he could negotiate a price reduction on the Barber Ranch for dealing in other investment opportunities with Loney. Finally, and most significant, we relate to the role which Loney played in this case. Loney was not a credible witness. His testimony is riddled with inconsistencies and feigned ignorance. With respect to the MPOG #2 investment, Loney executed a farmout agreement between Fulton Producing Company and MPOG Co. As *221 a result, neither MPOG #2 partnership nor MPOG Co. would have received an IDC deduction. Additionally, Loney filed a partnership return for MPOG #2 showing a $340,000 investment by petitioner. It is clear that the partnership never received this money due to the fact that Loney pocketed this amount in his personal savings account. Prior to placing this money in this savings account, it appears that Loney orchestrated a confusing plan whereby he continually switched the $340,000 amount in the form of a certificate of deposit from himself to petitioner and back to Loney. It is evident that petitioner never had control of the money after December 23, 1975. When petitioner was under audit, he requested that Loney supply him with his rights under the partnership agreement. Loney wrote that petitioner still had a continuing interest in the drilling in 1979 even though he knew that the partnership was defunct at that time. With respect to the property purchase, Loney testified that he knew nothing about the John Hancock loan. In fact, all testimony detrimental to petitioner concerning the purchase price is conveniently traced to Peters who was dead at the time of trial. However, *222 Loney does admit that, if he did reduce the price of the Barber Ranch, he never communicated this fact to petitioner. Furthermore, Wood, who was a thoroughly credible witness, testified that while he thought that there was a $340,000 deposit made by petitioner on the Barber Ranch at the time of sale, he subsequently learned from Peters that Loney had spent the $340,000 on an oil agreement. Thus, it appears that Loney was telling different stories about the $340,000 amount in an effort to keep the money for himself. [15]
In summary, respondent has failed to provide any evidence that petitioner knew that it was a scheme to evade taxes or had the requisite intent to evade fraudulently the payment of Federal tax. We find that petitioner was *223 the unfortunate victim of Loney's schemes. Consequently, we conclude that respondent has not established by clear and convincing evidence that any part of petitioner's underpayment of taxes for 1975 or 1977 was due to fraud. [16] Accordingly, we find that petitioner is not liable for the addition to tax for fraud under section 6653(b). Respondent pleads in the alternative that petitioner is liable for additions to tax for negligence pursuant to section 6653(a). Respondent raised this issue in his answer and therefore bears the burden of establishing by a preponderance of the evidence that some part of petitioner's underpayment is due to negligence or intentional disregard of rules and regulations. Rule 142(a). Under section 6653(a) negligence is lack of due care or failure to do what a reasonable and ordinarily prudent person would do under *224 the circumstances. . We find that respondent has not shown that petitioner was negligent. If a taxpayer commits an error due to an honest misunderstanding of the law of which an average reasonable man might be capable, the negligence addition is not applied. , affd. on another issue . See also , affd. . Even if the taxpayer could have avoided the error based upon his mistaken conception of the law if he had been better advised, the addition should not be imposed. . Moreover, the negligence addition will not be imposed if a taxpayer is misguided and unsophisticated in the realm of tax law but has acted in good faith. . See also . The taxation of oil and gas and natural resources is *225 a difficult area, especially for the uninitiated. Petitioner conceded respondent's disallowance of his IDC deductions in 1975 and his advance minimum royalty deduction in 1977 due to retroactive changes in the law. [17] Petitioner had consulted Franklin, his accountant, as to the correctness of these deductions before filing his returns. Accordingly, based on the record before us, we find that petitioner was not negligent within the meaning of section 6653(a) and determine that petitioner is not liable for the addition to tax for negligence under section 6653(a). Given the result reached in this case, we need not consider whether the additions to tax pursuant to sections 6653(a) and (b) are tax pursuant to section 6659 (a) which may be offset by investment credit carrybacks under sections 38 and 46. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
2. On December 23, 1981, respondent issued notices of deficiency to petitioners for the taxable years 1970 through 1980 and a notice of deficiency to petitioner Marvin G. Palmer only for the taxable year 1969. First, respondent disallowed a deduction of $340,000 on petitioners' 1975 1040 return resulting from Marvin G. Palmer's investment in an oil and gas limited partnership. The deficiencies and additions to tax determined by respondent for taxable years 1969 through 1973 resulted from the disallowance of net operating loss carrybacks from taxable year 1975. For petitioners' taxable year 1977, respondent disallowed an advance minimum royalty expense. The deficiency and addition to tax for 1974 results from the disallowance of net operating loss carrybacks from both the 1975 and 1977 taxable years. Petitioners have conceded both the $340,000 deduction for intangible drilling costs in 1975 and the $168,000 advance minimum royalty deduction in 1977. Second, respondent determined deficiencies in minimum tax affecting taxable years 1976 through 1980. The parties have agreed to a minimum tax for the years 1976 through 1980 of $9,895.15. Third, respondent determined that for taxable years 1978 and 1979, petitioners earned compensation from a medical service corporation. In a case involving different taxpayers, the District Court of the Western District of Washington considered the same issue and granted the taxpayers' motion for summary judgment. Minor v. United States, Court No. C81-614V. The summary judgment is on appeal to the Ninth Circuit Court of Appeals. The parties agreed that if the Ninth Circuit has not ruled on this matter by the time reply briefs are due, petitioners would concede this issue. As the parties have not advised the Court of the status of this case as agreed and we do not find any published opinion of the Ninth Circuit Court of Appeals on this case, we hold that petitioners concede the issue. Finally, respondent concedes that the fraud addition is applicable only to petitioner Marvin G. Palmer. As a result, "petitioner" in the singular form hereinafter refers to petitioner Marvin G. Palmer.↩
3. The Tri-Cities area is located in the southeastern corner of the State of Washington and is composed of the cities of Richland, Pasco, and Kennewick.↩
4. The Barber Ranch was part of a 30,000 acre tract which the partnership of Dean Loney, Jack Wood, and Jim Peters had an option to purchase. Originally, Quadrant, a subsidiary of the Weyerhauser Corporation, and the ArizonaColorado Land and Cattle Company (ACL) held the option to purchase this tract. After the Peters and Wood construction company (of which Jack Wood and Jim Peters were principals) were hired by Quadrant and ACL to complete a study on the land, the partnership of Loney, Wood and Peters acquired a 10 percent interest in the option. The partnership acquired sole rights to the option in 1976 and ultimately purchased only 19,838 acres of the 30,000 acre tract.↩
5. At this point in time, the partnership of Loney, Peters, and Wood had not acquired sole rights to the option to purchase the 19,838 acres. The partnership did not acquire sole rights to the option until immediately before the closing date. ↩
6. Unirrigated land in Benton County generally sold for around $150 - $175 an acre. The appraisal puts the land at about $175 per acre. The price of $350 per acre was considered high. A purchase price of $960,000 for the Barber Ranch represented a price of $245 per acre.↩
7. In general, petitioner kept his own business financial records. His records were detailed and exact.↩
8. Due to the option, petitioner's mortgage and loan application for the Barber Ranch not only listed his wife as co-signator but Loney, Peters, Wood, and their wives. The $520,000 mortgage also lists Peters and Wood Company as a co-signator. ↩
9. The North Patterson Company was essentially the partnership of Loney, Wood and Peters and was set up to orchestrate the option purchase of the 19,838 acres.↩
10. When Loney signed the farmout agreement with Fulton Producing Company on behalf of MPOG Co., there also existed a "drilling and oil well development agreement" between MPOG #2 and J.D. Oil Company dated October 1, 1975. It is unclear what purpose, if any, the MPOG Co. served.↩
11. Petitioner apparently had other information on MPOG #2's activities including maps.↩
12. As relevant to this case, sec. 6653(c)(1) defines "underpayment" for purposes of sec. 6653 as a "deficiency" as defined in sec. 6211.↩
13. In 1982, this Court ruled that prepaid intangible drilling costs cannot be taken in a year in which the costs are not incurred. , affd. . Advance royalty payments may be deducted only as the mineral products are sold. This was made effective as of October 29, 1976, when final regulations were issued on December 19, 1977. See , affd. sub nom. , affd. per curiam .↩
14. Respondent reaches this conclusion as follows: $ 340,000
Property Deposit
520,000
1st Mortgage - John Hancock Co.
440,000
Note - North Paterson Co.
$1,300,000
Subtotal
2,763
Interest on (first two Certificates
of Deposit
$1,302,763
Total Purchase
↩
C.D. Purchase Date
Dec. 23, 1975
Jan. 22, 1976
Yield percent (as a decimal)
.0475
.0500
Divided by 360 day year (standard)
360
360
Multiply by 30 days
30
30
Multiply by Principal
340,000
340,000
Equal Yields dollars
1,345.83
1,416.67
15. We note that in reversing a criminal conviction against Loney for filing false tax returns under sec. 7206, the Ninth Circuit stated that Loney was "the central figure" setting up the MPOG partnership implicated in the 14-count indictment. In particular, the court noted that Loney's "knowledge of the operation was superior to that of the other participants." .↩
16. Respondent concedes that we need not consider respondent's argument that petitioner received interest income of $2,700 for 1976 if the Court determines that petitioners did not pay $1,302,700 for the Barber Ranch. We have found that petitioner paid $960,000 for the Ranch and, as a result, we need not consider respondent's argument.↩
17. See footnote 13, supra.↩